GRACE BROWN, The (BEAN v.).    See Case No. 1,171.

---

## Case No. 5,651.

### The GRACE DARLING.

#### [2 Hask. 278.] [1]

District Court, D. Maine.    Nov., 1878.

MARITIME LIEN — WAGES — MINOR SEAMAN—EXEMPTION OF VESSEL FROM ARREST—APPLICATION OF ACTS OF CONGRESS.

1. The crew of a steamer, comprised of sharesmen and strikers engaged in porgy fishing, have a maritime lien upon the vessel for their wages, but the master does not.

2. Such crew, upon being refused payment for their services at the time agreed upon, may enforce their lien upon the vessel before their term of service has expired.

3. The ten days' exemption from arrest of a ship under Rev. St. §§ 4546, 4547, is waived by appearance, claim and answer without protest, after that time has elapsed.

4. Semble, that the objection should be taken by special plea.

5. The provisions of Rev. St. §§ 4546, 4547, apply only to merchant ships and their masters and crews.

6. Title 51, Rev. St., does not apply to vessels and crews engaged in porgy fishing.

7. The crew of a fishing vessel, not having signed shipping articles as required by title 51, Rev. St., may collect their shares or wages.

8. Title 53, § 4612, Rev. St., applies only to merchant vessels.

9. A minor may recover his wages as seaman upon a libel promoted by his father as prochein ami, where the father has agreed that the son may receive his own wages.

In admiralty. Libel in rem by the master and crew of a porgy steamer to recover their shares or wages. The owners filed claim and answer and evidence was taken.

Enoch Knight, George F. Holmes, and A. A. Strout, for libellants.

Washington Gilbert, for claimants.

FOX, District Judge. The libel is in rem, against a steamer employed in porgy fishing the past summer on the coasts of Maine and Massachusetts, and was filed on the seventh of October by the master and crew, to recover for their services, the steamer being then in this port for repairs on her boiler. The crew commenced their services about May first, and continued them until October fifth. The claimants are Messrs. H. & G. W. Lord of Boston, by virtue of sundry mortgages from Luther Maddox, on all but 14-130ths of the steamer, for which interest there is no appearance.

Maddox was engaged in the manufacture of fish oil from porgies, at Boothbay, and had the control and use of the Grace Darling, as her general owner, receiving from her, her entire fares, excepting when sold for bait. He contracted with the master for his employment, and authorized him to en-

1 [Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]

gage his crew. Some of the crew were sharesmen; others were known as strikers; the former were more experienced hands, and by usage were entitled to half the proceeds of the catch if made into oil, and to one third of the proceeds realized from sales for bait. From the amount thus coming to the sharesmen were paid the strikers and cook, who were hired by the master at fixed rates of wages, and also the cost of victualling the ship.

The master and mate were each to receive a share, and in addition, the master, in the present instance, by virtue of a written contract with Maddox, was entitled to a commission of eight cents per barrel; the mate's commission was one cent per barrel; and these commissions were to be paid from the owners' moiety. The master and crew were engaged verbally to serve on board the steamer in their several capacities during the entire fishing season, and which had not terminated at the institution of this process; by the terms of the agreement, the crew were to be paid on the first of August all then due to them, which had been done, with the exception of the mate; after that time, they were to be paid monthly; these payments had not been made, although repeatedly demanded from Maddox; and, just prior to the filing of the libel, he was notified by the crew that they were ready to continue their employment on being paid the amount to which they were then entitled, and, if this was not done, they should institute process for their recovery.

The first objection made by the claimants is that, for the services thus rendered by the crew of this steamer, there was no lien upon the vessel. In the case of The Helen M. Pierce [Case No. 6,332], this court had occasion to examine this question; and it was then decided that strikers, for their services while on board a porgy steamer, acquired a maritime lien; whether the sharesmen had or not a similar lien was not then decided, as the question did not arise in that case; but on further reflection, there is not apparent any reasonable ground for any distinction between the two cases; and no such distinction is anywhere referred to in any decision within the knowledge of the court. Whether a lien on the vessel, in behalf of her crew, does or not attach, depends on the nature of the services and the locality in which they are rendered, and not upon the method of ascertaining the amount of compensation to which the party may be entitled.

In the earliest periods of maritime commerce, a common method of compensating the mariner was to allow him a share in the profits of the voyage. These vessels are, for nearly the whole of the season, employed in cruising about on the high seas, upon the coasts of Maine and Massachusetts, taking the fish in immense seines, and only returning to the shore to discharge at the oil factories the fish they may have caught. These services are, in the opinion of the court, clearly mari-

time; and until instructed to the contrary, I must hold that, whether they are rendered by the sharesmen, or by others of the crew who may be entitled to a fixed amount as wages, they have in each case acquired the usual and ordinary maritime lien of the seaman upon his vessel for his wages.

In The Hibernia [Case No. 6,455], Judge Sprague decided that the crew of a whaling ship, who were to be paid by shares of the catch, had a lien upon the ship for their wages; and the same principle was recognized by Betts, J., in the Sarah Jane [Id. 12,348], which was a proceeding in rem by the crew of a vessel employed in the seal fishery, who were to receive a share of the proceeds of the sealing voyage; and also by Ware, J., in The Lucy Anne [Id. 8,596], where a seaman of a fishing vessel, in a proceeding in rem, recovered his wages in proportion to his catch, and also his share of the fishing bounty.

It is further claimed that the libellants had not completed their contract, which was, to serve the entire fishing season, as the libel was filed before the season had terminated; but, when it is remembered that it was also one of the terms and conditions of the contract, that the crew should receive their wages monthly, after the first of August, and that they had served two months without payment, although repeatedly demanded, it is quite apparent that the breach of the contract in a most material matter was first committed by the owner, and that, after notice to him by the crew that they should insist on payment or would no longer continue in his employment, they were justified in attempting to enforce their claims on the vessel.

It is insisted, that the arrest of the ship was premature, and can not be sustained. The original libel was filed October seventh; the same day a warrant of arrest issued, and she was seized thereon, process being made returnable October fourteenth. October seventeenth, claimants appeared and filed their claim, and gave bond for costs. October eighteenth, some of the crew, who had not joined in the libel originally, petitioned for leave to become parties, and were permitted so to do. October seventeenth, an answer was filed by the claimants, requiring proof of services, and pleading that no lien therefor existed against the vessel. October eighteenth, an amendment to the libel was filed and allowed, correcting certain errors in the credits and amounts of the claims of the respective libellants. On the same day, the day of hearing, an amended answer was filed, pleading the minority of one of the libellants, Wm. E. Baker, and also that, when the libel was filed and process issued, ten days had not elapsed from and after the end and completion of the entire voyage or service for which the libellants contracted and shipped, nor from the time when they were entitled to payment; that their contract was for the entire fishing season, which would not terminate until November fifteenth or thereabouts; that said

steamer had not left her port of delivery where the voyage ended, nor was she about to proceed to sea within ten days, and therefore the court has not jurisdiction. The claimants having on October seventeenth filed their answer, contesting the claims on their merits, by an amendment filed at a subsequent day attempt to invoke the exemption of a vessel from arrest for the ten days provided under sections 4546, 4547, Rev. St.

In reply, it may well be argued with great force, that such an exception being of a merely dilatory nature, not touching the merits of the claims, should have been presented by a special dilatory plea before any general answer upon the merits was made. Such appears to have been the opinion of Betts, J., in The Edward [Case No. 4,289], which was a libel in rem for wages. An objection similar to the present was presented in the answer; and in his opinion that learned judge on page 288, remarks: "The claimant, by appearing and contesting the claim upon the merits, must be deemed to have waived all right of exception to the regularity of the proceedings." See, also, The William Harris [Id. 17,695].

In Certain Logs of Mahogany [Case No. 2,-559], Story, J., says: "The objection is in its own nature a mere declinatory or dilatory objection in the nature of a plea in abatement; and not peremptory, as a bar on the merits. It being preliminary in its character, it should have been taken, if at all, by a special plea in the nature of a plea in abatement, known in the practice of the ecclesiastical and admiralty courts by the appellation of a dilatory or declinatory exception, which is always brought forward before the contestatio litis, or general defence in bar or general answer upon the merits."

The filing of the libel within the ten days is not prohibited by the act. Process only is suspended for that period. When that time has elapsed, a new warrant for her seizure could issue, and the vessel be then taken thereon, and if the claimant then appears in the cause and without protest or objection asserts his right to the property, and makes full answer upon the merits, it may well be argued that he thereby submits to the jurisdiction of the court and waives all further objection to process against the vessel, and by so doing, relieves the court from the necessity of dismissing the suit or vacating the arrest of the ship, and compelling the libellants to institute anew their process against her.

The libel itself was within the jurisdiction of the court at the time it was filed; but, for a limited time only, the res was not subject to seizure; and if so taken, the party might or not, as he thought for his interest, demand its release; but, if after the limitation has expired and he, by his plea, sees fit to call on the court to pass upon the merits of the cause, is it not too late for

him, at a day subsequent, to withdraw his concession and waiver of objection of which, at an earlier day, he could have availed himself? Having made his election, and interposed a full defence on the merits by formal answer, the irregularities of service may be regarded as waived, and the cause may proceed, as if the proper seizure had been had before the answer was filed.

In Granon v. Hartshorne [Case No. 5,689], Judge Betts, very forcibly, presents similar views, in a case strongly analogous to the present. I am, therefore, inclined to the opinion, that, if this vessel had been an ordinary merchant ship, within these sections of the Revised Statutes referred to by the claimants, on these pleadings, they should not be permitted, at this stage of the cause, to avail themselves of this objection.

In the case of The David Faust [Case No. 3,595], Judge Blatchford says: "It has always been held in this court, that, when a seaman was discharged from a vessel after his arrival, either arbitrarily or with his assent, the discharge terminated the contract, and the provision for ten days' delay after delivery of the cargo is released, and the seaman may proceed at once for his wages. The shipmaster or owner may waive the statutory provision in regard to the ten days' delay, and is held to have done so, in case he discharges a seaman without paying him his wages."

If sections 4546, 4547, are to receive a similar construction in the present instance, the ship owner violated his contract by non-payment of the crew's wages as agreed; and they were thereby discharged from further liability to continue their employment, and could at once seek redress against the vessel. The language of section 4546 is somewhat different from that in section 6 of the act of 1790 [1 Stat. 133], and may require a different construction; as by the latter, process might issue if the wages were not paid within ten days after the discharge of the cargo; while by section 4546, process could issue, if the wages are not paid within ten days after the time when the same ought to be paid according to the provisions of the statute.

I am not able to find in title 53 any provision fixing the time of payment of wages to a seaman engaged on a fishing cruise, and who has not signed any agreement; and if this is so, then the case is not affected by sections 4546, 4547; but the party may proceed in rem to recover his wages to which he is entitled by his parol agreement. In The Waverly [Case No. 17,301], Judge Dyer holds that the variance between the two statutes are of phraseology only, and that title 53 treats exclusively of cases where seamen had entered into employment under a written contract.

In the opinion of the court, a conclusive reply to this ground of defence is, that these provisions of the law are not applicable to this class of vessels and their crews, but are to be restricted to merchant ships and those employed thereon. This provision is found in title 53, "Merchant Seamen," and, so far as the court can discover, it has always been confined to the crews of merchant vessels. These sections were substantially re-enactments of section 6, c. 29, Laws 1790, the title of which chapter is: "An act for the government and regulation of seamen in the merchant service."

In 1792 [1 Stat. 229], by an act entitled "An act concerning certain fisheries of the United States and for the regulation and government of the fishermen employed therein," congress provided that there should be a written agreement with the skipper and crew of vessels over 20 tons burthen, employed in the banks and other cod fisheries, setting forth the terms of shipment, &c., and that, whenever such agreement shall be so made and signed, a lien shall be created on the vessel for the shares of the skipper and other fishermen for the term of six months after the fish shall be sold, whenever they shall have been delivered to the owner or his agent for sale. This act was temporary, but was afterwards continued in force, and its provisions were extended to vessels engaged in the mackerel fishery by act of 1865, and were re-enacted in the Revised Statutes, tit. 51, "Regulation of Fisheries."

It is manifest, that congress did not consider these provisions relative to enforcing the liens of merchant seamen on their vessels as applicable to the crews of fishing vessels; but, that it deemed it necessary, by express legislation, to provide therefor, and, by specific and definite provisions, recognize the lien of the fishermen upon the vessel for the amount they are entitled to for their services, limiting the duration of such lien for such length of time as was deemed reasonable for them to avail themselves of this security.

The only enactments to be found, regulating fisheries and the right of the crew to a lien for the proceeds of their catch, are those referred to in title 51; and these are restricted to certain kinds of fisheries, and are not general in their application. Those engaged in cod and mackerel fishing can avail themselves of these provisions in title 51, and of no others. Whalemen are not within this title, as in the whale fisheries, no statute has fixed any of the rights of those engaged in such adventures, or required the contract of the crew to be in writing. Curt. Merch. Seam. 60; The Atlantic [Case No. 620].

In Flaherty v. Doane [Case No. 4,849], it was held that seamen who had served on a cod fishing voyage, at monthly wages, had a lien on the remnants saved from the wreck for their wages, thus applying the general principles of the maritime law to the crew of a cod fishing vessel. Whether the pro-

visions of sections 4546, 4547, as they are found in the act of 1790 were or not applicable to the crew of a fishing vessel was in fact decided by Judge Ware in the case of The Ianthe [Id. 6,992]. This was a proceeding in rem, and the learned judge on page 127, says: "The fishing trade of the country is, and always has been regulated by its appropriate and peculiar system of laws"; and, on page 129, says as to the act of 1790, "Nor can it be made to reach an ordinary fishing voyage without doing violence to the language, or interpolating words, which the legislature have not seen fit to use."

The remedies provided for certain classes of fishermen, being restricted and not general, cannot be held to include those who may be employed in other fisheries which were never followed when the law was originally enacted. Long since was it decided that the provisions of the law applicable to cod fisheries and licenses for that pursuit could not be made to include those who were following the mackerel fishery. Such was the opinion of Mr. Justice Story; and although an opinion of Mr. Justice Woodbury in U. S. v. The Reindeer [Case No. 16,145], might, perhaps, occasion some doubts upon this point, they are forever disposed of by the opinion of Judge Clifford in U. S. v. The Paryntha Davis [Id. 16,003], and for like reasons, the regulations in behalf of the crews of cod and mackerel vessels can not reach and protect the crews of steamers engaged in porgy fishing.

If by any forced construction, porgy fishermen could be deemed to be included within the regulations of title 51, the libellants could not be bound thereby, as the shipping articles required by this title were never executed by one of them. They are, therefore, in the same position as the libellants in the case of The Ianthe [supra], and must depend on their contract and such remedies for its enforcement as upon general principles of maritime law they are entitled to.

It has not escaped the attention of the court that section 4612, in title 53, declares "that, in the construction of this title, every person having the command of any vessel belonging to any citizen of the United States shall be deemed to be the master thereof, and every person, apprentices excepted, who shall be employed or engaged to serve in any capacity on board the same shall be deemed and taken to be a 'seaman.'" This is a re-enactment of section 45, c. 322, Act 1872 [17 Stat. 271].

If this language is to be taken literally, it is clear that the construction given by the court to sections 4546, 4547, is erroneous. That a literal construction was not the intent of congress is demonstrated from the fact that such an interpretation would necessarily include the vessels employed in cod and mackerel fishing, which congress had previously specially provided for in title 51; some restriction therefore, must be placed on the broad general language found in section 4612; and as the title of the act indicates the class of vessels to which it is applicable, those in the merchant service, it is not a forced construction of the language employed in the latter section, to construe its general provisions as limited to merchant vessels; especially, as in one or two instances, when congress intended that vessels, not falling within the description of merchant vessels, should be made subject to certain particular provisions of the title, they have manifested such intention by express mention of such vessels; as for instance, in section 4569, they require vessels engaged in whale or other fisheries, or in sealing, to be provided with lime juice or other anti-scorbutics; and in section 4576, the master of every vessel bound on a foreign voyage, or engaged in the whale fishery, is required to give bond to produce a list of his crew, on return to the United States; such specific enactments would hardly have been necessary if the general provisions of the act were intended to include vessels of every description.

The master of the Grace Darling claims a lien for his services, and relies upon section 4593, which confers on the skipper of a vessel employed in the cod or mackerel fishery the same lien for his wages or share of the catch, as the crew are entitled to when the written agreement required by the statute has been executed. This steamer was not thus employed, and such an agreement was never executed; and the master, therefore, can only avail himself of the general provisions of the maritime law; and by these, it is admitted that he is debarred from any lien on the ship for his services.

One of the libellants is a minor, prosecuting his claim by his father as pro. ami. It is objected, that the father was entitled to his son's wages, and should, therefore, have instituted the libel in his own behalf. In the opinion of the court, by an agreement with the father, the son was entitled to his earnings on this vessel; and any judgment which may be recovered therefor in the present suit, in the name and by the authority of the father as pro. ami, will afford entire protection against any suit which may be hereafter instituted by the father, for the recovery of these earnings of the son, for his own personal benefit. Decree for libellants with costs, excepting the master. Libel as to him, dismissed without costs.